

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 6, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **ISMAIL ESSA BHAI,** | § | **Case No. 23-30690-sgj7** |
| Debtor. | § | Chapter 7 |
| _____ | § | |
| | § | |
| **ANNE ELIZABETH BURNS, in her** | § | |
| **Capacity as Chapter 7 TRUSTEE,** | § | |
| Plaintiff, | § | |
| | § | **Adversary No. 24-3003-sgj** |
| v. | § | |
| | § | |
| **MICHAEL BRODER,** | § | |
| Defendant. | § | |
| _____ | § | |

### MEMORANDUM OPINION AND ORDER GRANTING
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### IN FRAUDULENT TRANSFER ADVERSARY PROCEEDING

1

## I.    **INTRODUCTION**

The above-referenced adversary proceeding ("Adversary Proceeding") pertains to the bankruptcy case of Mr. Ismail Bhai (the "Debtor" or "Ismail").[1] Ismail filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on April 5, 2023 ("Petition Date"). The bankruptcy case has at times been contentious, with many attorneys appearing and withdrawing from representing the Debtor over time. The Debtor eventually moved (with and through counsel) to waive his discharge, on July 10, 2024, rather than litigate a separate adversary proceeding in which his entitlement to a bankruptcy discharge was being challenged. This court approved his waiver of discharge on August 29, 2024. But still the bankruptcy case lingers.

The Adversary Proceeding now before the court is one brought by the Chapter 7 Trustee, as plaintiff ("Trustee" or "Plaintiff"). The Trustee seeks to avoid and recover two allegedly fraudulent transfers (actual or constructive) pursuant to §§ 548 and 550 of the Bankruptcy Code, or, alternatively, pursuant to § 544 and Tex. Bus. & Com. Code §§ 24.001, et seq., a/k/a the Texas Uniform Fraudulent Transfer Act ("TUFTA"). The defendant, later defined, was an individual who was the president of a finance company that lent funds **to the Debtor's adult son**.

Indeed, the Debtor's adult son has been a significant figure during this bankruptcy case and in connection with this Adversary Proceeding. The Debtor's son is named Raheel Bhai ("Raheel" or "Debtor's Son"). Raheel was engaged in real estate investments. Raheel is an admitted fraudster. Prior to the Petition Date, Raheel pled guilty to federal wire fraud charges relating to his real estate endeavors. A recurring question in this bankruptcy case has been whether the Debtor was aware

---

[1] The court will sometimes use the Debtor's first name for ease of reference herein, since there is another "Mr. Bhai" who is relevant in this Adversary Proceeding—specifically the Debtor's adult son, Raheel Bhai.

of or participated in his son's fraud. Ismail was an insurance agent (Farmers Insurance Agency) who says he had no involvement with his son's real estate endeavors.[2]

The victim of Raheel's confessed, criminal fraud was a lender known as BSPRT CRE Finance, LLC, which was succeeded by Benefit Street Partners Realty Operating Partnership, L.P. and BSP Of Finance, LLC (collectively, "Benefit Street"). Benefit Street is the largest creditor in this bankruptcy case. Benefit Street made a $149.7 million real estate loan (the "Benefit Street Loan") to an entity called IBF Properties, LLC ("IBF") in 2022, which Raheel personally guaranteed. The purported purpose of the Benefit Street Loan was to allow IBF's refinancing of existing secured debt it had related to a portfolio of 24 real properties on which Walgreens drugstores were tenants.[3] Raheel was later accused of misrepresenting numerous things about the Walgreens properties including their values, rents that they generated, and certain alleged liens on them. In fact, a portion of the proceeds of the Benefit Street Loan (to be exact, $21,906,500) was transferred—not to a legitimate existing secured lien holder on the Walgreens drugstores—but to an entity called EPI Commercial Finance, LLC ("EPI"), which Raheel had misrepresented had a junior lien on the aforementioned Walgreens drugstores. EPI, in fact, was a sham entity created and owned by Raheel.  EPI had no legitimate liens. Raheel had only created/formed EPI a few days before the Benefit Street Loan closed.[4] Essentially, Raheel created a fake company with fake liens on Walgreens stores. He will be sentenced for this crime soon.

---

[2] Ismail also has testified that he worked some at the front desk of a Hampton Inn that an entity called Riba Hospitality Fund I, LLC owned. Ismail claimed to have no ownership in it. Ismail testified that his son Raheel owned this Hampton Inn. Def. App'x 101-102, 199. References to the appendix submitted in support of the Defendant's motion for summary judgment, which appears at DE # 35 in this Adversary Proceeding, will be designated as "Def. App'x ___" and references to the appendix submitted by the Plaintiff/Trustee in opposition to the motion for summary judgment, which appears at DE ## 44-49 (six different volumes) will be designated as "Pl. App'x ___." The page numbers in such references pertain to the appendix page number(s)—not the page number(s) on the original document.
[3] Pl. App'x 916.
[4] Def. App'x 89.

Where did the $21,906,500 of the Benefit Street Loan proceeds that were transferred to the sham EPI entity next go? Here's where things become relevant to this Adversary Proceeding. The money that EPI received (to allegedly payoff the sham junior liens of EPI on the Walgreens stores) was transferred from an EPI bank account into a bank account ending in x3537—the control of which is under dispute—but on which the bank account statements reflect three account holders: **the Debtor, Raheel, and Rozmeen Bhai** (the "Family Account"). Rozmeen Bhai is the mother of Raheel and the ex-wife of the Debtor. They all live in the same house that the Debtor has owned for decades. Thereafter, money was transferred out of the Family Account to various people, including a total of $1,950,000 to Michael Broder who is the defendant in this Adversary Proceeding ("Broder" or "Defendant").

Who is Broder? Broder is an individual who is the president of a financial services company called Cross Timbers Capital ("CTC"). CTC had previously extended more than $2.6 million of loans to **Raheel (personally)** and to **a separate entity Raheel owned called RA Capital** (the "CTC Loans"). The court is required, in this Adversary Proceeding, to decide whether the $1,950,000 transferred to Broder (the "Broder Transfers"), for alleged repayment of the CTC Loans, constituted fraudulent transfers made **by the Debtor Ismail**.

There are three main issues. (1) Was the Debtor himself even insolvent at the time of the Broder Transfers? (2) If so, did the Debtor have an interest in the property transferred from the Family Account to Broder? (3) Finally, was Broder an "initial transferee" from whom recovery can be sought, as contemplated by § 550 of the Bankruptcy Code (considering that the Broder Transfers were intended-and were immediately used—to pay off the CTC Loans, and it was apparently an error that the Broder Transfers went first to Broder)?

4

Defendant Broder has brought a motion for summary judgment on these issues. The court concludes that the unrefuted summary judgment evidence (and timeline) establishes, as a matter of law, that the Debtor was ***not*** insolvent (nor in a situation where he was left with unreasonably small capital or inability to pay his debts), at the time of the Broder Transfers. Therefore, for this reason alone, the Defendant is entitled to summary judgment. The court briefly addresses the other two issues, since the parties have presented them to the court.

## II.    PARTIES, JURISDICTION, AND VENUE

Plaintiff Anne Elizabeth Burns is the duly appointed Trustee of the Debtor's Chapter 7 bankruptcy estate. Defendant Broder is an individual resident of Texas. Bankruptcy subject-matter jurisdiction exists in this Adversary Proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (H), so this court has statutory authority to enter a final judgment. Moreover, the court has constitutional authority to enter a final judgment because the parties have consented to the bankruptcy court issuing final orders. Venue is proper pursuant to 28 U.S.C. § 1409.

## III.    UNDISPUTED FACTS

As alluded to above, this Adversary Proceeding and the Broder Transfers stem from a much broader set of facts.

On April 18, 2022, Benefit Street's predecessor-in-interest entered into a loan agreement (the "Loan Agreement") with IBF, a Texas limited liability company, governing the Benefit Street Loan.[5] Raheel signed the Loan Agreement as "Sole Member" of IBF's Managing Member (of which he was the 100% member).[6] In connection with the Benefit Street Loan, also on April 18, 2022, IBF executed two promissory notes in the aggregate original principal amount of

---

[5] Pl. App'x 1.
[6] *Id.* at 139 & 150.

$149,700,000.00.[7] Raheel also signed the two promissory notes as "Sole Member" of IBF's Managing Member.[8] As security for the Benefit Street Loan, IBF executed 24 security instruments, granting the predecessor-in-interest to Benefit Street first-priority security interests and liens in IBF's real and personal property in 10 states, which consisted of 24 parcels of commercial real estate with Walgreens stores as existing tenants (collectively, the "Collateral").[9] IBF was, at all relevant times, nominally owned and controlled by the Debtor's Son, Raheel.[10]

In connection with the Benefit Street Loan, Raheel executed a Guaranty of Recourse Obligations (the "Raheel Guaranty"), individually guaranteeing repayment of IBF's obligations under the Benefit Street Loan Agreement and promissory notes.[11]

On April 18, 2022, loan proceeds in the amount of $149,700,00.00 under the Benefit Street Loan were funded. At closing of the Benefit Street Loan, in accordance with payoff letters provided by each, the following amount were paid: $112,533,891.35 to Revere Capital (a legitimate lienholder on the Walgreens stores); $11,709,023.59 to AccessBank Texas (another legitimate lienholder on the Walgreens stores); and $21,906,500.00 (the "EPI Loan Proceeds") to EPI. As earlier noted, EPI was a sham lienholder.

The timeline of events at this point forward is very relevant.

On April 19, 2022, EPI received a wire transfer in the amount of $21,906,500 from the title company handling the Benefit Street Loan closing. These funds were wired into EPI's bank account at Bank of America ending in x9139.[12] The summary judgment record shows that only Raheel and Rozmeen were signers on this account.[13] Then also on April 19, 2022, this same

---

[7] *Id.* at 163-170.
[8] *Id.* at 166 & 170.
[9] *Id.* at 35, 55, 69-70, 87, 122, 141-148, 916.
[10] *Id.* at 150, 170-202.
[11] *Id.* at 603.
[12] *Id.* at 843-845.
[13] *Id.* at 641 & 643.

amount ($21,906,500) was wired into a bank account at Bank of America ending in x3537, which is the account referred to herein as the "Family Account." It is referred to as the "Family Account" for the reason that the bank statements show all three names of Raheel, Ismail, and Rozmeen as account holders.[14]

Here's where things involve the Defendant Broder. Within days of the closing of the Benefit Street Loan, several transfers were made out of the Family Account,[15] including a total of $1,950,000 to Broder. This amount consisted of two payments to Broder, the first on ***April 22, 2022***, in the amount of $650,000, the second on ***April 25, 2022***, in the amount of $1,300,000 (together, the "Broder Transfers").[16] There is no dispute about this tracing of the funds-flow. As earlier noted, Broder is the president of CTC, a financial services company that had previously extended loans to an entity owned and controlled by Raheel called RA Capital Addison, LLC ("RA Capital"), as well as loans to Raheel personally. For example, there was a $1.2 million loan on April 30, 2021 (with a May 1, 2022 maturity date), which Raheel personally guaranteed (the "CTC/RA Capital Loan"), and three additional personal loans to Raheel: one on March 15, 2022 (with an April 15, 2022 maturity date), in the amount of $450,000; one on March 16, 2022 (also with an April 15, 2022 maturity date), in the amount of $200,000; and one on April 18, 2022 (with a May 18, 2022 maturity date), in the amount of $800,000 (collectively, the "CTC/Raheel Loans).[17] In other words, $2,650,000 of loans made by CTC to Raheel and to RA Capital. ***There is nothing in the summary judgment record suggesting that the Debtor Ismail had any***

---

[14] Pl. App'x 847.
[15] Note that the "Family Account" appeared to be comprised of the "Wealth Management MMS Money Market Savings" account (the account ending in x3537) and the "Adv Plus Banking" account (the account ending in x2392) for which there were "combined statements" generated and are collectively referred to herein as the "Family Account." All three family members names are shown on the bank statements for these accounts. E.g., Pl. App'x 855, 859, 863, 865.
[16] *Id.* at 848.
[17] Def. App'x 2-3, 8-22.

***involvement with these loans***. CTC was apparently introduced to Raheel in 2020 by an acquaintance of theirs at a local title company who said Raheel at times needed capital for real estate deals, and CTC specializes in real estate projects. The CTC/RA Capital Loan was secured by certain real property in Addison, Texas, but the three CTC/Raheel Loans were unsecured and, again, Raheel personally was the borrower. Raheel represented that the CTC/Raheel Loans would be used for earnest money in connection with the purchase of several Walgreens stores and would be repaid after the financing of those stores was completed.[18]

Fast forward to the payments to Broder on April 22 and 25, 2022. A title company (Miller Title) contacted CTC sometime in April 2022, and asked CTC for a "payoff" letter in connection with the CTC/RA Capital Loan and the CTC/Raheel Loans. CTC sent the title company a payoff letter indicating $2,846,780.47 was the total amount due.[19] Due to what the defendant characterizes as erroneous instructions in the payoff letter for the "Ray Bhai Loans"[20], the repayments of these loans (i.e., the Broder Transfers) were sent to Mr. Broder's personal bank account rather than to a CTC bank account.[21] There is a text trail and email trail in the summary judgment evidence that suggest, in the days following the payments, confusion on Broder's part as to where the funds had been wired—as he was not seeing the funds in CTC's accounts.[22] These messages are between Raheel and Broder.[23] The summary judgment evidence shows that there was a subsequent transfer

---

[18] *Id.* at 2-3.
[19] *Id.* at 4.
[20] The defendant knew Raheel Bhai by his nickname, Ray. The court notes that the payoff letter does state "Please wire the funds to Michael Broder using the following instructions" which is followed by Wells Fargo Bank account information.  Def. App'x 24.
[21] *Id*.
[22] *Id.* at 28-40.
[23] *Id.* at 28-30.

of the funds received (i.e., the Broder Transfers) from Broder's personal account to CTC's account.[24] In any event, the payments to Broder were wired from the Family Account.[25]

Continuing with the timeline, the summary judgment evidence included a signature card for this Family Account from whence the Broder Transfers were made. All three family members had signed the signature card as joint account holders with rights of survivorship.[26] The signatures are dated *__May 10, 2022__* (roughly three weeks ***after*** the Broder Transfers).

Fast forward a couple of months later. Benefit Street learned of the fraud perpetrated in connection with the Benefit Street Loan quite soon after the closing (the exact date is not clear from the summary judgment evidence—but it appears to have all come to a head in *__July 2022__*, less than three months after the closing of the Benefit Street Loan). How did Benefit Street learn? Raheel approached Benefit Street for a potential second, larger loan for a different portfolio of properties, after the closing of the Benefit Street Loan, and, during follow-up due diligence for this possible second loan, certain inconsistencies led Benefit Street to reexamine the original Benefit Street Loan. Benefit Street confronted Raheel who admitted to falsifying information and requested an opportunity to quickly repay the Benefit Street Loan.[27] Pursuant to this turn of events, IBF and Raheel made aggregated payments to Benefit Street of $2.5 million on July 8, 2022, and another $2.5 million on July 11, 2022.[28] Thereafter, a Forbearance Agreement dated July 13, 2022 ("Forbearance Agreement"), was executed by and among Raheel, IBF, and Benefit Street.[29] The recitals therein are quite explicit regarding the fraud. For example, at paragraph F, it states that "In connection with the underwriting and diligence process prior to the closing of the [Benefit Street]

---

[24] *Id.* at 42-46.
[25] *Id.* at 26.
[26] *Id.* at 223.
[27] Pl. App'x 917.
[28] *Id.* at 590.
[29] *Id.* at 589.

Loan, Borrower [IBF] and Guarantor [Raheel] forged, falsified and submitted to Lender, with intent to deceive Lender, various documents, including, but not limited to, rent checks, purchase and sale agreements, closing statements, leases, and estoppel certificates . . . which materially overstated the rent and lease terms of the leases at the Property."[30] At paragraph G, it states that Benefit Street's predecessor relied on these documents and would not have made the Benefit Street Loan had true documents been provided.[31] The Forbearance Agreement contemplated that IBF and Raheel would deliver to Benefit Street certain weekly payments going forward and also *contemplated delivery of Guaranties from both Ismail and Rozmeen (Raheel's mother), in connection with the Benefit Street Loan*.[32] Raheel signed the Forbearance Agreement as "Sole Member" of IBF's Managing Member and also individually as a "Guarantor."[33] And the same day, on July 13, 2022, the Debtor Ismail executed an absolute and irrevocable guaranty (the "Guaranty") in favor of Benefit Street Partners.[34] *Thus, on July 13, 2022, the Debtor Ismail, for the first time, became contractually liable on the Benefit Street Loan*. The Guaranty states that Ismail was "the parent of Raheel Bhai who is the owner of direct or indirect equity or beneficial ownership interest in Borrower [IBF], and therefore, Guarantor will directly benefit from Lender entering into the Forbearance Agreement."[35] The Debtor testified in a deposition that he signed the Guaranty but did not read it when he signed it.

To make a long story short (well, less lengthy), there were soon defaults under the Forbearance Agreement; then on July 21, 2022 (just eight days after the signing of the Forbearance Agreement and Guaranty) all three family members left the United States for Sharjah in the U.A.E. and then

---

[30] *Id.* at 589.
[31] *Id.* at 590.
[32] *Id.* at 592.
[33] *Id.* at 599 & 600.
[34] *Id.* at 603-616.
[35] *Id.* at 603.

Pakistan, where they stayed for eight months (a journey that was allegedly prompted by the need to attend a family funeral)[36]— and then all three of them returned home in March 2023, at which time Raheel quickly struck a plea bargain with the United States Attorney pertaining to his dealings with Benefit Street.[37] Meanwhile, during the overseas trip, Benefit Street obtained, on October 20, 2022, a joint and several default Judgment against Ismail, Raheel, Rozmeen, IBF, and EPI, in the amount of $158,613,381.88.[38] Thus, to the extent that Benefit Street held only a contingent claim against Ismail before (as a result of the Guaranty Ismail signed on July 13, 2022), it then (as of October 20, 2022) had a liquidated claim against him for the first time.

Ismail filed a Chapter 7 bankruptcy petition on April 5, 2023, shortly after returning from the overseas trip to Pakistan. Ismail testified that he lost his Farmers Insurance Agency business while overseas and he now works at a gas station for income.[39] The Trustee brought this Adversary Proceeding on June 9, 2023, to recover the $1,950,000 in transfers to Broder on the grounds that Ismail had an interest in the funds in the Family Account from which the Broder Transfers were made, that Ismail was insolvent at the time of the Broder Transfers, and that Broder (who received but soon transferred the Broder Transfers to CTC) was an initial transferee pursuant to § 550 from whom the Broder Transfers can be recovered.

Depositions submitted show Ismail professed no knowledge of EPI, IBF, or any of the subject matter of this Adversary Proceeding. He testified that he thought his name was added to the Family Account as a matter of convenience or for purposes of emergencies; that he never made any deposits or withdrawals from it; that he never saw bank statements; and that he did not know

---

[36] Def. App'x 97-99.
[37] Id. at 71-91.
[38] Pl. App'x 919.
[39] Def. App'x 101, 108-109.

Broder.[40] He denied having any property interest in the Family Account. It has been represented

to the court by the parties that Raheel is still waiting for criminal sentencing and is apparently not

talking (not surprisingly). The Debtor has never been indicted nor named as an unindicted co-

conspirator.

## IV.    <u>LEGAL STANDARD</u>

Summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate whenever

a movant establishes that the pleadings, affidavits, and other evidence available to the court show

that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of

law.[41] The Supreme Court has instructed that Rule 56 "mandates the entry of summary judgment,

after an adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."[42] The Supreme Court has explained that "[i]n such a

situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."[43] A genuine issue of material fact is present when the evidence is such that a

reasonable fact finder could return a verdict for the nonmovant.[44]

When considering the summary judgment record, courts may not "weigh the evidence or

make credibility determinations."[45] But the courts must, of course, decide what evidence warrants

---

[40] *Id.* at 103-113.
[41] *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006). A bankruptcy court may grant summary judgment under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056.
[42] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).
[43] *Celotex*, 477 U.S. at 322–23.
[44] *Piazza's Seafood World*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[45] *Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018).

consideration.[46] Under Rule 56, a movant meets his initial burden of showing there is no genuine

issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case."[47]

But the movant "need not 'negate' the elements of the nonmovant's case."[48] If the moving party

meets his initial burden, then the burden shifts to the nonmovant to show that there is a genuine

issue of material fact for trial.[49] And "the nonmovant must go beyond the pleadings and designate

specific facts showing there is a genuine issue for trial."[50]

Courts must view the facts "in the light most favorable to the nonmoving party," but "only

if there is a 'genuine' dispute as to those facts."[51] The mere existence of a factual dispute is not

enough to create a *genuine* and *material* dispute such that the nonmoving party may survive an

otherwise properly supported summary judgment motion.[52] Simply creating "some metaphysical

doubt" as to the facts is insufficient: "Where the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"[53]

Moreover, "it is not incumbent upon the court to comb the record in search of evidence

that creates a genuine issue as to a material fact."[54] Rather, the nonmoving party has the duty of

pointing to evidence that gives rise to a genuine dispute as to a material fact.[55] Distilled to the core,

"[s]ummary judgment is appropriate where critical evidence is so weak or tenuous on an essential

---

[46] *Id.* (citations omitted).

[47] *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir. 1990) (citations omitted).

[48] *Little*, 37 F.3d at 1075 (citations omitted).

[49] *Latimer*, 919 F.2d at 303.

[50] *Little*, 37 F.3d at 1075 (citation omitted). *See also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment.").

[51] *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)).

[52] *See id.* (citing *Liberty Lobby*, 477 U.S. at 247–48).

[53] *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[54] *Hutton Commc'ns, Inc. v. Commc'n Infrastructure Corp.*, 461 F. Supp. 3d 400, 403 (N.D. Tex. 2020) (citing *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003)).

[55] *Celotex*, 477 U.S. at 324.

fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant."[56]

## V.   **DISCUSSION**

As noted, the Trustee seeks to avoid and recover the $1,950,000 sent from the Family Account to Broder. The Trustee alleges that the Broder Transfers constituted avoidable and recoverable fraudulent transfers under §§ 548 and 550 of the Bankruptcy Code, as well as under § 544 and §§ 24.005 or 24.006 of TUFTA.

The Bankruptcy Code Options. Bankruptcy Code § 548 allows the Trustee to "avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor . . . (A) ["Actual Fraud"] made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . indebted"; or (B) ["Constructive Fraud"] "received less than a reasonably equivalent value in exchange for such transfer" and "was insolvent," "was engaged in business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with the debtor was an unreasonably small capital," or "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured." Notably, with "Constructive Fraud" under § 548 of the Bankruptcy Code, a trustee must prove that at the time of a challenged transfer, a debtor was "insolvent" or trending in that direction. The court will refer to this as the "Insolvency/Near Insolvency Prong."

TUFTA Options. Similarly, Bankruptcy Code § 544(b) allows a trustee to "avoid any transfer of an interest of the debtor . . . that is voidable under applicable law by a creditor holding

---

[56] *Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir. 1993) ("We no longer ask whether literally little evidence, *i.e.*, a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury." (citing *Liberty Lobby*, 477 U.S. at 251)).

an unsecured claim." The "applicable law" here is TUFTA. Under TUFTA there are very similar "Actual Fraud" and "Constructive Fraud" standards—the primary difference being that the reach-back period for avoidable transfers is four years rather than two years. Section 24.005 deals with transfers that might be fraudulent as to present or future creditors. Under TUFTA § 24.005 a "transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made . . . if the debtor made the transfer . . . : (1) ["Actual Fraud"] with actual intent to hinder, delay, or defraud any creditor of the debtor"; or (2) ["Constructive Fraud"] without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Thus, for purposes of § 24.005 Constructive Fraud, there is the "Near Insolvency" requirement, as opposed to the "Insolvency" requirement. Meanwhile, TUFTA § 24.006 deals with transfers that might be fraudulent as to present creditors. Under § 24.006, a "transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." Thus, for purposes of § 24.006 Constructive Fraud, there is an insolvency requirement.

In summary, under TUFTA and under § 548 of the Bankruptcy Code, to establish a Constructive Fraud claim, it is crucial that the trustee prove the debtor was insolvent or at least trending there. And, even with Actual Fraud, insolvency is a significant factor from which a court might infer intent to hinder, delay, or defraud because, under TUFTA, unlike the Bankruptcy Code,

for purposes of proving "Actual Fraud," there is a laundry list of factors that should be considered badges of fraud, and one of them is that "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred."[57]

> **A.  There Is No Summary Judgment Evidence Suggesting that the Debtor was Insolvent on the Date of the Broder Transfers, Nor that He Became Insolvent as a Result of the Broder Transfers, Nor that he was About to Engage in a Business or Transaction for Which His Remaining Capital Was Unreasonably Small, Nor That He Intended at the Time of the Broder Transfers to Incur Debts Beyond His Ability to Pay It.**

One dispute as to the Trustee's constructive fraudulent transfer claims centers around whether the Debtor met the Insolvency/Near Insolvency Prong at the time of the challenged transfer. The Trustee contends that the Insolvency/Near Insolvency Prong was met for two reasons: (1) first, due to the Debtor's alleged liability (or culpability) for his part in the $149.7 million fraud perpetrated by Raheel against Benefit Street; and/or (2) second, even if Ismail did not play a part, *per se*, in Raheel's fraudulently obtaining the Benefit Street Loan, the Debtor knew (at the time of the April 22 and 25, 2022 Broder Transfers) of his own imminent obligation under the Guaranty with Benefit Street, which was executed on July 13, 2022, pursuant to which he intended to incur debt beyond his ability to pay. Thus, Ismail was essentially trending toward insolvency at the time of the Broder Transfers even if he was not technically insolvent yet.

A person is insolvent under the Bankruptcy Code if the sum of his debts "is greater than all" of his "property at a fair valuation."[58] Insolvency under TUFTA can be proven either by showing (1) that "the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," or (2) by showing that the debtor "is generally not paying the debtor's debts as they become due."[59]

---

[57] TUFTA § 24.005(b).
[58] 11 U.S.C. § 101(32)(A).
[59] TUFTA § 24.003(a), (b); *Janvey v. Dillon Gage, Inc. of Dallas,* 856 F.3d 377, 387 (5th Cir. 2017).

16

### 1. The Debtor was not Insolvent due to his Alleged Liability for his Part in the Fraud Committed Against Benefit Street

Consistent with the above statutory definitions, courts have held that a debtor is insolvent if his liabilities exceed his assets. According to Ismail's bankruptcy schedules[60], his liabilities only totaled $432,285.66 without the debt created by the Guaranty.[61] Ismail's assets totaled $506,460.00.[62] Based on his bankruptcy schedules, Ismail was solvent without the debt created by the Guaranty. Moreover, the only summary judgment evidence that exists indicates that Ismail was paying his debts as they came due at the time of the Broder Transfers, and thereafter, until execution of the Guaranty.[63] The Trustee has not provided any summary judgment evidence to dispute that it was not until July 13, 2022—when Ismail signed the Guaranty to Benefit Street (again, three months *after* the Broder Transfers)—that Ismail became insolvent. To be clear, Ismail had no obligation whatsoever to Benefit Street until he signed the Guaranty on July 13, 2022. There is nothing in the record showing a conviction or any other legal proceeding before a court finding the Debtor explicitly liable to Benefit Street, until the default judgment on his Guaranty in October 2022.  Moreover, the Debtor has testified that he was not an officer or director of IBF or EPI, and the Trustee has not presented any corporate filings that indicate otherwise. Because there is no evidence from the Trustee to rebut the Debtor's evidence about his assets and solvency at the time of Broder Transfers, the court concludes that there is not a genuine issue of disputed fact here.

### 2. The Debtor was not Insolvent, Nor Trending Insolvent, at the time of the Broder Transfers

As noted, the Debtor signed the Guaranty with Benefit Street on July 13, 2022, nearly three months after the Broder Transfers occurred. Broder argues that the Debtor was not insolvent at the

---

[60] Def. App'x 224-248.
[61] *Id.* at 236-240.
[62] *Id.* at 232.
[63] *Id.* at 100, 202-203.

17

time of the Broder Transfers because Ismail had no obligation until the day the Guaranty was signed. Both parties agree that the moment the Debtor signed the Guaranty with Benefit Street on July 13, 2022, he became insolvent due to his obligations within the Guaranty. The Trustee concedes that the Guaranty was signed post-transfer but argues that Debtor's knowledge of his "imminent obligation" under the Guaranty is enough to constitute insolvency. Notably, neither party cited case law to support their points on this matter.

The Trustee's argument here hinges on the notion that, although the Debtor had not yet signed the Guaranty with Benefit Street at the time of the Broder Transfers, he intended to, and Debtor's mere knowledge of this intent to incur an imminent obligation was enough to meet the Insolvency/Near Insolvency Prong. But the Trustee provides no evidence here to show that the Guaranty was being contemplated in late April 2022 when the Broder Transfers occurred. Without any evidence, these are mere conclusory allegations that the Debtor knew of an imminent obligation and was aware of the pendency of the execution of the Guaranty that would render him insolvent.

The Trustee acknowledges in her response that both § 24.006(a) of TUFTA and § 548(a)(1)(B)(i)(I) of the Code, require that the Trustee make a showing that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Moreover, the Trustee acknowledges that § 24.005(a)(2) of TUFTA requires that the Trustee show the Debtor was "engaged *or was about to engage in* a business or a transaction, for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[64] Even if the Trustee proved that the Debtor was

---

[64] TUFTA § 24.005(a)(2)(A)-(B) (*emphasis added*).

contemplating signing the Guaranty in late April 2022 when the Broder Transfers were made, it is still not clear that the Debtor was "about to" engage in a transaction since the actual signing did not occur until nearly three months later.

The court concludes that the Trustee did not meet her burden of establishing that there is a material fact issue regarding Debtor's insolvency or trending insolvency at the time of the Broder Transfers. Here, the record taken as a whole could not lead a rational trier of fact to find that the Debtor was insolvent or trending there on the date of the Broder Transfers, and there is no material fact issue on this point. Therefore, the Trustee's constructive fraudulent transfer claims would fail as a matter of law.

Of course, insolvency or trending insolvency is not a strict requirement of Actual Fraud. As alluded to earlier, TUFTA provides a non-exclusive list of badges of fraud that may be considered in determining actual intent on the part of a debtor and insolvency is one of them. The badges of fraud listed in the statute are:[65]

1. the transfer was to an insider [there is no evidence that Broder was an insider]

2. the debtor retained possession or control of the property transferred after the transfer [there is no evidence of this]

3. the transfer was concealed [there is no evidence of this]

4. before the transfer was made the debtor had been sued or threatened with suit [there is no evidence of this]

5. the transfer was of substantially all of the debtor's assets [addressed below; the evidence suggests the assets were not Debtor's]

6. the debtor absconded [the Debtor and Raheel and Rozmeen did leave for Pakistan three months after the Broder Transfers]

7. the debtor removed or concealed assets [there is no evidence of this]

---

[65] *See* TUFTA § 24.005(b) (stating "consideration may be given, ***among other factors***, to" the listed badges of fraud) (emphasis added).

8.      the value of consideration received by the debtor was [less than] reasonably equivalent to the value of the asset transferred . . . [there was no known consideration received by Debtor]

9.      the debtor was insolvent or became insolvent shortly after the transfer was made . . . [addressed above]

10.      the transfer occurred shortly before or shortly after a substantial debt was incurred [addressed above; Ismail's Guaranty debt was incurred *three months after* the Broder Transfers]

11.      the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor [not applicable]

As shown above, almost none of the so-called badges of fraud exist here with regard to Ismail. But, as shown below, there is still another reason that both the Constructive Fraud and Actual Fraud theories must fail here.

**B.  The Summary Judgment Evidence is Insufficient to Create a Fact Issue that the Broder Transfers were Made from Property in Which Debtor Had an Interest**

As noted earlier, a transfer by a debtor is only avoidable under the Bankruptcy Code as a fraudulent transfer to the extent that it was of a property interest of the debtor.[66] TUFTA imposes a similar requirement by defining a "transfer" as "every mode … of disposing of or parting with an asset or an interest in an asset" and an "asset" is the "property of a debtor."[67] Whether the debtor has an interest in the property is determined according to applicable state law.[68] The Supreme Court held in *Perlman v. Reliance Ins. Co.,*[69] that property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.

---

[66] 11 U.S.C. § 548(a)(1).
[67] TUFTA § 24.002(2),(12).
[68] *Butner v. U.S.* 440 U.S. 48, 54 (1979).
[69] 371 U.S. 132, 36 83 S. Ct. 232 (1962).

The Trustee points to three facts from the summary judgment evidence that she says support a theory that the Broder Transfers were made from property in which the Debtor had an interest: (a) the account holders on the Family Account were Raheel, Ismail, and Rozmeen (and bank statements going back to January 2022 reflect all three names on the bank statements); (b) Ismail signed a signatory card for the Family Account on May 10, 2022 (after the Broder Transfers); and (c) the family lived together, the Family Account bank statements went to their home address, the family sometimes ate and worshiped together, and went to Pakistan for eight months together—this all being evidence to perhaps infer a family partnership engaging in fraud, such that they should all be deemed liable to Benefit Street and the funds in the Family Account a product of their joint fraud. On this later point, the Trustee cites the recent case Supreme Court case of *Bartenwerfer v. Buckley*[70] where the Court essentially held (in a § 523(a)(2) context) that a faultless individual may be responsible for another's debt if a special relationship exists.

To determine whether a transfer is of "an interest of the debtor in property," courts apply a two-step analysis, focusing on: (1) the nature of the debtor's interest in the transferred asset under applicable state property law and (2) whether the state-law defined property interest becomes "property of the estate" under the Code.[71]

This two-step process was explained in *IFS Fin. Corp.* In that case, the bankruptcy court began its analysis by noting that it was "faced with the situation where an account is legally in the name of one entity but effectively controlled by an individual for the benefit of the entities he controls and directs."[72] The court noted that under Texas law, legal title does not always determine

---

[70] 598 U.S. 69, 143 S. Ct. 665 (2023).

[71] *In re IFS Fin. Corp.,* 417 B.R. 419,434 (Bankr. S.D. Tex. 2009), *aff'd sub nom. IFS Fin. Corp. v. Garcia Suarez,* H-09-CV-3059, 2010 WL 11652027 (S.D. Tex. Sept. 11, 2010), *aff'd sub nom. In re IFS Fin. Corp.,* 803 F.3d 195 (5th Cir. 2015) *and subsequently aff'd,* 669 F.3d 255 (5th Cir. 2012)*; In re: Dickinson of San Antonio, Inc.,* No. 5:19-CV-01237-XR, 2021 WL 3500781, at *17 (W.D. Tex. Aug. 9, 2021)*.

[72] *IFS Fin. Corp.*, 417 B.R. at 434.

the true owner.[73] With respect to a bank account, the bankruptcy court noted further that the Texas

Supreme Court had found that "The true owner is not determined by a 'legal relation ... but must

be reached by determining the probative force of the facts shown.'"[74]

In the second part of the two-part test, the bankruptcy court focused on whether the transfer

was property of the estate. The court found "control" to be the most important factor in determining

whether a transfer was property of the estate.[75] The bankruptcy court in *IFS Fin. Corp.* assessed

whether the debtor used its control over the assets of the third-party account to routinely pay off

creditors. The court ruled as follows:

> [W]hether the debtor had "unfettered discretion to pay creditors of its own
> choosing, including its own creditors ... is ... the primary consideration in
> determining if funds are property of the debtor's estate ...").
> ...
> If the debtor determines the disposition of funds from the third party and
> designates the creditor to be paid, the funds are available for payment to
> creditors in general and the funds are assets of the estate. In this event,
> because the debtor controlled the funds and could have paid them to anyone,
> the money is treated as having belonged to her for purposes of preference
> law whether or not she actually owns it.[76]

## 1.   *The Nature of Debtor's Interest Under State Law*

The first step, according to *IFS Fin. Corp.*, is to determine the true owner of the funds in a

bank account.[77] The Trustee contends that Ismail has legal title to the Family Account primarily

because his name was one of three on the account and he had signatory authority. Putting to the

---

[73] *Id.* at 435.
[74] *IFS. Fin. Corp.,* 417 B.R. at 435 (quoting *Silsbee State Bank v. French Mkt. Grocery Co.,* 132 S.W. 465, 466 (1910).
[75] *Id.* at 436.
[76] *IFS. Fin. Corp.,* 417 B.R. at 435 (quoting *Southmark Corp. v. Crosz (In re Southmark)*, 49 F.3d 1111, 1116–17 (5th Cir. 1995), and *Caillouet v. First Bank & Trust (In re Entringer Bakeries, Inc.)*, 548 F.3d 344, 350 (5th Cir. 2008)). Both the district court and the 5th Circuit affirmed the bankruptcy court in *IFS Fin. Corp.*
[77] *IFS. Fin. Corp.,* 417 B.R. at 434.

side the fact that Ismail did not sign a signatory card until after the Broder Transfers, the existence

of a signatory card (or a name on an account) does not indicate legal title to funds in the account.

Generally speaking, under Texas law, a joint account belongs to the parties ***in proportion***

***to their net contributions*** unless there is clear and convincing evidence of a different intent.[78]

As for joint accounts, Texas recognizes that it is not at all unusual for a person to deposit

his or her funds into an account upon which another person is authorized to draw merely for the

convenience of the depositor.[79] In such situations, the "owner of the money intends only to

facilitate disbursement of the funds for his or her own purposes, not to transfer title to the co-

signator on the account."[80] Thus, the "creation of a joint account does not ... necessarily create

ownership in the co-signator on the account."[81] Therefore, while a party to a joint account is

entitled to lawfully draw monies from the joint account, that authority alone, neither establishes

the party's ownership of the funds, nor authorizes divestment of title to the funds from the actual

owner. And for that reason, mere presence of a name on an account or a signature card is, by itself,

legally insufficient evidence of ownership of the funds in the subject account. In other words,

signatory authority fails to raise a fact issue unless accompanied by other evidence that establishes

ownership.

The lack of probative value of mere "signing authority" in determining the estate's

ownership of an account or the funds it held was addressed in *In re Eagleton*.[82] In *Eagleton*, a

---

[78] Tex. Est. Code Ann. § 113.102; *see also In re Michelena*, 641 B.R. 325, 343 (Bankr. S.D. Tex. 2022) ("Texas Estates Code § 113.102 provides that '[d]uring the lifetime of all parties to a joint account, the account belongs to the parties in proportion to the net contributions by each party to the sums on deposit unless there is clear and convincing evidence of a different intent.' Although a party to a joint account is entitled to lawfully draw money from the account that authority alone does not establish the party's ownership of the funds.").
[79] *Hicks v. State*, 419 S.W.3d 555, 558-59 (Tex. App. –Amarillo 2014) (quoting *Stauffer v. Henderson*, 801 S.W.2d 858, 861 (Tex.1990)).
[80] *Id.*
[81] *Hicks*, 419 S.W.3d at 559 (quoting *Bailey v. State*, No. 03–02–00623–CR, 2003 WL 22860220, at *5–6, 2003 Tex.App. LEXIS 10141, at *15 (Tex. App.- Austin December 4, 2003, pet. ref'd) (not designated for publication)).
[82] No. 04-44085-DML-7, 2004 Bankr. LEXIS 1001 (Bankr. N.D. Tex. July 22, 2004).

creditor sought to garnish funds held in a joint account.[83] The debtor, Mrs. Lori Eagleton, and her mother were signatories to the account.[84] The account was originally owned by the mother, who added Mrs. Eagleton as a signatory in case of emergency.[85] Mrs. Eagelton testified that her name was only added to the account as a matter of convenience and for emergencies.[86] Mrs. Eagleton denied receiving any bank statements regarding the account.[87] Mrs. Eagleton further testified that she never deposited, withdrew or spent any funds in the account.[88] No evidence was presented showing that Mrs. Eagleton had a role in maintaining the account.[89] Mrs. Eagleton neither contributed nor spent any funds in the account.[90] The court ruled against the creditor after finding that the debtor had no equitable title to any portion of the account.[91]

Here, the Debtor testified in three different depositions that he had no knowledge of the Family Account and denied making any deposits or withdrawals from the Family Account.[92] Indeed, the summary judgment evidence shows no contributions into the Family Account by anyone other than the $21.9 million transferred into the Family Account from EPI on April 19, 2022 (i.e., the funds that EPI obtained from the Benefit Street Loan on April 18, 2022). During the § 341(a) meeting of creditors, Ismail testified that his name was added to the Family Account as a matter of convenience and there is no summary judgment evidence to contradict any of this.[93] This case is similar to the *Eagleton* case in that Ismail, like Mrs. Eagleton, was added to the Family Account as a matter of convenience (no evidence to the contrary); Ismail, like Mrs. Eagleton,

---

[83] *Id.* at *4.
[84] *Id.* at *2.
[85] *Id.*
[86] *Id.* at *7.
[87] *Id.*
[88] *Id.*
[89] *Id.* at *9.
[90] *Id.* at *11-*12.
[91] *Id.* at *16.
[92] Def. App'x 112, 196.
[93] *Id.* at 113.

denied ever making any deposits to or withdrawals from the Family Account (no evidence to the contrary). The Trustee's sole piece of evidence to support an argument that Ismail had a property interest in the Family Account seems to be the signature card and Ismail's name on the Family Account.

The case of *Douglass v. Douglass (In re Douglass)*[94], is further instructive. It stresses the fact that even if a debtor is a signatory to a joint account, and has authority to withdraw funds in the account, withdrawn funds are not property of the debtor absent unfettered discretion to use the funds.[95] The facts in *Douglass* are disturbing. There, Stephen had a joint account with Sonia.[96] Sonia was Stephen's mother.[97] There was no dispute that the funds in the joint account came from Sonia. There was also no dispute that Sonia granted Stephen direct access to the funds in the joint account.[98] Stephen's use of the funds in the joint account was, at various times, with Sonia's consent.[99] However, after some time, Stephen began using the funds in the account arbitrarily and without Sonia's authority for whatever financial needs he might face.[100] Sonia knew of some of the unauthorized withdrawals but decided not to take any action.[101] Things changed when Sonia learned that Stephen had sexually assaulted his own daughter – her granddaughter.[102] Stephen withdrew funds from the joint account to pay the attorney's fees for his criminal defense.[103] Stephen later filed bankruptcy, and Sonia filed a complaint seeking a determination that Stephen's unauthorized withdrawal of funds from the joint account created a nondischargeable liability.[104]

---

[94] Adv. No. 13-4106, 2015 WL 6446305 (Bankr. E.D. Tex. Oct. 23, 2015).
[95] *Id*. at *28.
[96] *Id*. at *2-*3.
[97] *Id*. at *1.
[98] *Id*. at *5.
[99] *Id*. at *3.
[100] *Id.*
[101] *Id.*
[102] *Id.* at *14.
[103] *Id.* at *16.
[104] *Id.* at *1.

The court found that Stephen breached his fiduciary duty and committed civil theft.[105] Notwithstanding his signatory authority, the *Douglass* court held that Stephen's liability to Sonia was nondischargeable under 11 U.S.C. § 523(a)(4) because it arose from fraud and embezzlement; this result was premised on Stephen's unauthorized use and/or taking of funds that did not belong to him.[106]

The *Douglass* case seems to properly apply Texas law in determining that a debtor's name on a joint account and his signatory authority, and even his actually withdrawing funds from that joint account are legally insufficient to establish any property interest in the funds of the joint account. There, the debtor-Stephen's name was on the joint account and Stephen had authority to withdraw funds from the account. Despite these facts, the funds in the joint account belonged to Sonia (as she had deposited the funds therein). Stephen was held liable for civil theft of Sonia's funds. Similarly, Ismail, like Stephen, is a signatory to the Family Account. Ismail, like Stephen, had authority to withdraw funds from the Family Account (by virtue of the signatory card). Ismail, like Stephen, did not deposit any funds in the Family Account. Therefore, following *Douglass*, the fact that Ismail had the ability to make a withdrawal from the Family Account does not make the funds in the Family Account property of Ismail.

The court reiterates that, even if the signatory card was sufficient summary judgment evidence to create a fact issue as to Ismail's possible part ownership of the Family Account, this card was dated May 10, 2022—***after*** the Broder Transfers (on April 22 and 25, 2022). But, in any event, under Texas law, Ismail, as a signatory to the Family Account, was merely authorized to withdraw funds from that account.  This does not, in and of itself, create a property interest in the

---

[105] *Id.* at *38.
[106] *Id.*

funds in the Family Account.[107] Signature cards do not establish ownership of funds in a joint account.[108]

The Trustee's response to all of this is that the court should zero in on the fact that transferred funds (and all funds in the Family Account) resulted from the fraud committed against Benefit Street. These funds, according to the Trustee, ***were obtained through the family's alleged fraudulent acts against Benefit Street***, and every party who participates in a fraud is liable and responsible for acts of others done in furtherance of the fraudulent scheme. Accordingly, the transferred funds were property of the estate because the Debtor, along with Raheel and Rozmeen, obtained them through fraud.

The Trustee's argument is seemingly derived from the *Bartenwerfer* case, mentioned earlier.[109] This case involved husband and wife, Chapter 7 debtors, who had formed a partnership for the purpose of remodeling and selling a house that they jointly owned prepetition. One of the

---

[107] *See also Jenkins v. Chase Home Mortg. Corp. (Matter of Maple Mortg. Inc.)*, 81 F.3d 592 (5th Cir. 1996) (Fifth Circuit acknowledged that even if a bank account is in the debtor's name, transfers from that account are not necessarily transfers of an interest of a debtor in property). *Maple Mortgage* placed the burden on the bankruptcy trustee to prove that the debtor had unfettered discretion to use the funds in a bank account in order for such funds to be deemed as property of the estate. The trustee could not rely solely on the fact that Maple had legal title to the account. Unfettered discretion over funds in a bank account means that a debtor can use the funds in the account to pay its own creditors; *In re Southmark Corp.*, 49 F.3d 1111, 1116-1117 (5th Cir. 1995).

[108] *Stauffer v. Henderson,* 801 S.W.2d 858, 861 (Tex. 1991) ("Frequently, the only written agreement of the parties which might reflect their intent is the signature card or similar form provided by the depository and signed when the account is opened. The principal purpose of such forms, however, is to authorize the depository to pay funds in the account upon the direction of any part. . .")("A joint account agreement which authorizes funds to be paid to or withdrawn by one party allows the party to insist that the depository honor a request for payment but does not establish the right of that party to the funds against other claimants. Thus, the account agreement provided by the depository and signed by the parties ordinarily authorizes delivery of the funds to any party to a joint account but may or may not settle the issue of actual ownership of the funds."); *Hicks*, 419 S.W.3d at 558–59 n.3 ("Again, access to a joint account and ownership of the monies therein are two different matters. Simply being able to write checks upon or make withdrawals from it does not ipso facto vest the party making those withdrawals with title to the monies taken or otherwise supplant the right of the depositor to the money"); *Bailey v. State*, 2003 WL 22860220, at *5–6 (Tex.App.–Austin, Dec. 4, 2003, pet. ref'd) (The "[c]reation of a joint account does not ...necessarily create ownership in the co-signator on the account."); *IFS Fin. Corp. v. Suarez*, No. H-09-CV-3059, 2010 WL 11652027 (S.D. Tex. 2010) *aff'd sub nom. In re IFS Fin. Corp.,* 803 F.3d 195 (5th Cir. 2015)("Under Texas law, the legal titleholder to a bank account is not always the true owner."); *Douglass* ("As for ownership of monies in a joint account, a "joint account agreement which authorizes funds to be paid to or withdrawn by one party allows the party to insist that the depository honor a request for payment but does not establish the right of that party to the funds against other claimants.").

[109] *Bartenwerfer v. Buckley*, 598 U.S. 69 (2023).

debtors, Kate Bartenwerfer, was largely uninvolved. They ultimately sold the house to Buckley but failed to disclose several defects. Buckley sued in California state court and won. Both Bartenwerfers were held jointly liable. After the debtors filed for bankruptcy, the judgment creditor filed an adversary complaint objecting to the debtors' discharge. Kate Bartenwerfer argued that her debt could be discharged because it was her partner, not her, who defrauded Buckley. The Supreme Court ultimately held that her debt was nondischargeable because, under §523(a)(2)(A), "fraud liability is not limited to the wrongdoer. Understanding § 523(a)(2)(A) to reflect 'agnosticism' as to the identity of the wrongdoer is consistent with the age-old rule of fraud liability."[110]

*Bartenwerfer* does not address the acquisition of property interests through fraudulent means. It addresses liability of one who is in a partnership where another partner commits fraudulent acts. Notably, even if Ismail did participate in Raheel's fraud, then he would have been an unlawful actor and could not acquire title to the property in the Family Account from which the Broder Transfers were made. Contrary to the Trustee's argument that Raheel's fraud (and Ismail's possible participation therein) resulted in title to the Family Account funds vesting in Ismail, the opposite holds true. Under Texas law, title to stolen property remains with the original owner.[111] Thus, beyond the facts that: (a) Ismail was not a signatory on the Family Account when the $21.9 million of funds from the Benefit Street Loan were transferred into it; (b) was not a party to the Benefit Street Loan when it was made; and (c) was not a signatory on the Family Account when the Broder Transfers were made, Ismail could never have acquired any "interest" in the Benefit

---

[110] *Id*. at 598.
[111] *See Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211, 216 (Tex. App. 1984) ("One who purchases stolen property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner."); *Faulkner v. Am. Stone, Inc.*, No. 2-04-030-CV, 2005 WL 737432, at *2 (Tex. App. Mar. 31, 2005) (same); *see also Walker v. Caviness*, 256 S.W.2d 880, 882 (Tex. Civ. App. 1953) ("The common law rule is that a thief can never pass title to stolen goods, neither can anyone to whom he has attempted to transfer title.").

Street Loan proceeds even if, arguendo, he was a participant in Raheel's fraud. Given that the Trustee asserts the funds in the Family Account originated from Benefit Street, the transfers to Broder cannot be considered Ismail's property.

The court will not delve into this issue any further but reiterates that, while a party may be liable for fraudulent actions and the actions of others committed in furtherance of the fraud, that does not mean that the party has a property interest in the money procured via fraud.

### C.  The Defendant May Have Been an Initial Transferee

The Defendant argues in his motion that he was not an "initial transferee" as required under 11 U.S.C. § 550 so, at a minimum, the Trustee's claims for recovery from him relying on § 550 are invalid. Because the court is holding herein that the Trustee's claims for avoidance under § 548 and TUFTA fail as a matter of law, the court will not address this issue.

### VI.   <u>CONCLUSION</u>

As set forth above, the Defendant is entitled to summary judgment on two bases. First, the Trustee has put forth no summary judgment evidence that creates a genuine issue of material fact that might cause a reasonable fact finder to determine that Ismail was insolvent or trending toward insolvency at the time of the Broder Transfers. Second, the Trustee has put forth no summary judgment evidence that creates a genuine issue of material fact that might cause a reasonable fact finder to determine that Ismail made the Broder Transfers with actual intent to defraud.  Indeed, there is no evidence that Ismail himself made the Broder Transfers or knew about the Broder Transfers. And, at most, only two badges of fraud might have been present (departing for Pakistan three months after the Broder Transfers and receiving no known consideration relating to the Broder Transfers). Third, the Trustee has put forth no summary judgment evidence that creates a genuine issue of material fact that might cause a reasonable fact finder to determine that Ismail

had a property interest in the funds used to make the Broder Transfers. For the reasons articulated above, summary judgment for the Defendant is hereby **GRANTED.**

The Defendant should submit a Judgment that is consistent herewith.

**# # # # END OF MEMORANDUM OPINION AND ORDER # # # #**